**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| CAROL J. DELGADO, | ) | Case No. 20-08603 |
| | ) | |
| _____ Debtor. _____ | ) | Hon. Deborah L. Thorne |
| | ) | |
| GINA B. KROL, as chapter 7 Trustee for | ) | |
| the estate of Carol J. Delgado, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CAROL J. DELGADO; BRENT D. HOUCK; | ) | Adv. No. _____ |
| JAY DELGADO; JANAYE DELGADO; | ) | |
| NICHOLAS DELGADO; OUTSOURCE | ) | |
| SERVICES LLC; ELLSWORTH | ) | |
| INVESTMENT GROUP LLC; RAMCO | ) | |
| HOLDINGS LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT FOR EQUITABLE ACCOUNTING,
ENFORCEMENT OF PRIOR ORDERS, AND RELATED RELIEF**

Gina B. Krol, not individually but as the chapter 7 trustee (the "**Trustee**") for the

bankruptcy estate of Carol J. Delgado (the "**Estate**"), brings this Complaint against Carol J.

Delgado (the "**Debtor**"); her boyfriend, Brent Houck; her ex-husband, Jay Delgado; her adult

daughter, Janaye Delgado; her adult son, Nicholas Delgado (together, the "**Delgado Relatives**");

and related entities, Outsource Services LLC ("**Outsource**"), Ellsworth Investment Group LLC

("**EIG**"), and RAMCO Holdings LLC ("**RAMCO Holdings**") (together, with the Delgado

Relatives, the "**Delgado Insiders**," and the Delgado Insiders together with the Debtor, the

"**Defendants**") and states as follows:

## **NATURE OF THE ACTION**

1.      Throughout the nearly six years since the Debtor's alleged bank fraud scheme against CIBC was exposed, the Defendants have undertaken an intricate scheme to outsource substantially all of the Debtor's financial affairs to her family members and corporate proxies and to frustrate investigation of their prior and ongoing fraudulent activities (the "**Asset Concealment Conspiracy"**).

2.      To that end, the Defendants employed a series of sham transactions and arrangements to divert millions of dollars in loan and lease payments originally owed to the Debtor's wholly-owned companies, as well as tens of thousands of dollars in rental income owed to the Debtor personally, to corporate shells that have operated purely as the Debtor's alter egos.

3.      The Defendants have also repeatedly withheld assets in violation of turnover orders and, in other instances, dissipated and transferred assets in violation of citations to discover assets and the automatic stay in the Debtor's bankruptcy case. *Earlier this summer, they installed a new putative tenant in an investment property the Debtor and Houck have openly admitted is wholly owned by the Estate, and had the tenant pay more than $15,000 to Janaye Delgado and Outsource while the Trustee's turnover motion for that property and any related rents was pending before this Court*.

4.      The Asset Concealment Conspiracy has substantially harmed both the Estate and CIBC (whose claims against the Defendants the Trustee is entitled to assert as assignee). At this point, it is no longer a question of *whether* the Defendants are liable to Trustee. The only unknowns are *how much* are they liable for, *where* are they hiding their assets, and *what* legal theories, remedies, or processes need to be leveraged to reach those assets.

5.     By repeatedly refusing to provide even the most basic documentation or information needed to compile a complete picture of their wrongdoing and to sort out which assets properly belong to whom, the Defendants are actively colluding to preclude the Trustee from carrying out her duties.

6.     To finally get to the bottom of the Defendants' malfeasance and to obtain the relief required to move this case forward, the Trustee brings this complaint under sections 105(a), 363(h), 502(d), 541, 542, 544(a), and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"); Federal Rules of Civil Procedure 70 and Federal Rule of Bankruptcy Procedure 7070; and applicable federal and Illinois common law to:

(i)     compel the Defendants to prepare and submit a forensic accounting of all transactions among themselves, their family members, and their related entities since September 1, 2016;

(ii)     recover monetary damages resulting from the Defendants' conversion of certain property subject to the Turnover Order;

(iii)     hold each of the Defendants jointly and severally liable as co-conspirators for the actions, omissions, and conduct of each other and any other co-conspirator the Trustee subsequently identifies;

(iv)     enforce the Turnover Order and Compulsion Order in accordance with the provisions of Bankruptcy Rule 7070(b), (c), and (d);

(v)     avoid the Debtor's unrecorded conveyance of her interest in her Florida condominium to Houck and obtain authorization under section 363(h) of the Bankruptcy Code to sell that property free and clear of any interest of Houck; and

(vi)     disallow the claims asserted by Houck against the Debtor's estate.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because this adversary proceeding arises in and is related to a case under the Bankruptcy Code.

8.      This Court has personal jurisdiction over each Defendant pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1409. This adversary proceeding has been commenced in this district where the Debtor's bankruptcy case is pending.

10.     The claims for relief asserted herein arise under 11 U.S.C. §§ 105(a), 363, 502, 541, 542, 544, and 550;  Rule 70 of the Federal Rules of Civil Procedure; and Rule 7070 of the Federal Rules of Bankruptcy Procedure.

11.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) in which the Court may constitutionally enter final orders.  To the extent this adversary proceeding is deemed a proceeding in which the Court may not constitutionally enter final orders absent the consent of the litigants, the Trustee consents to the entry of final orders by the Court in this adversary proceeding.

### THE PARTIES

12.     Plaintiff Gina B. Krol is the permanent chapter 7 trustee for the bankruptcy estate of Carol J. Delgado, duly qualified and appointed by the Office of the United States Trustee pursuant to § 701(a)(1) of the United States Bankruptcy Code.

13.     Defendant Carol J. Delgado is an Illinois resident and the debtor in the above-captioned chapter 7 case.

14.     Defendant Brent Houck is a Florida resident and is the Debtor's co-defendant in the criminal case. Upon information and belief, the Debtor and Houck are in a romantic relationship and cohabitate from time to time.

15.     Defendant Jay Delgado is an Illinois resident and the Debtor's ex-husband.

16.     Defendant Janaye Delgado is an Illinois resident and is the adult daughter of the Debtor and Jay Delgado.

17.     Defendant Nicholas Delgado is an Illinois resident and is the adult son of the Debtor and Jay Delgado.

18.     Defendant Outsource Services LLC is an Illinois limited liability company.

19.     Defendant Ellsworth Investment Group LLC is an Illinois limited liability company.

20.     RAMCO Holdings LLC is a Delaware limited liability company.

## BACKGROUND

21.     On January 27, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida. (Case No. 20-11045-PGH (Bankr. S.D. Fla.), Dkt. 1.)

22.     On March 9, 2020, at CIBC's request, the Florida bankruptcy court ordered that the Debtor's case "be transferred immediately to the U.S. Bankruptcy Court for the Northern District of Illinois – Eastern Division." (Case No. 20-11045-PGH (Bankr. S.D. Fla.), Dkt. 34).

23.     On June 11, 2020, at the request of the U.S. Trustee, the Court entered an order converting this case to a case under chapter 7 and authorizing the U.S. Trustee to appoint a chapter 7 trustee. (Dkt. 50) (the "**Conversion Order**"). Thereafter, the U.S. Trustee appointed Gina B. Krol as chapter 7 trustee. (Dkt. 51).

**A.  The Debtor's Prepetition Businesses and Bank Fraud Scheme.**

24.     Before filing for bankruptcy, the Debtor owned and managed a variety of business ventures—most notably Financial Management Services, Inc. (together, with its subsidiaries, "**FMSI**") and Renewable Asset Management Company, LLC (together, with its subsidiaries,

"**RAMCO**"), which operated as project financing companies in the construction and solar industries, respectively.

25.    FMSI and RAMCO held numerous portfolios of equipment leases and project loans under which FMSI and RAMCO received monthly payments from their respective customers. To finance those transactions, the Debtor obtained loans and other financial accommodations for her corporate entities from CIBC Bank USA (f/k/a The PrivateBank and Trust Company) ("**CIBC**").

26.    Beginning at least as early as December 2014, and unbeknownst to CIBC at the time, the Debtor intentionally and fraudulently caused FMSI to submit false borrowing base certificates, which overstated eligible receivables, and upon which CIBC relied.

27.    For example, on August 5, 2015, FMSI's Vice President of Accounting, operating at the direction of the Debtor, emailed CIBC the FMSI Borrowers' borrowing base certificate for July and August 2015 and stated, "[i]f it is not to [sic] late Carol would like to draw $800k today." The borrowing base certificates included a $480,000 loan from the FMSI to EIG. EIG was, however, owned and managed by the Debtor, and therefore constituted an Affiliate within the meaning of the Loan Agreements. Any loan from FSMI to EIG was therefore not eligible collateral for the purposes of calculating FMSI's borrowing base. However, based on the Debtor's fraudulent misrepresentation that FMSI's loan to EIG constituted eligible collateral, CIBC disbursed the $800,000 in loan proceeds.

28.    The Debtor and her co-conspirators similarly included as eligible collateral in numerous other borrowing base certificates loans from FMSI to numerous other purportedly arm's length customers that, in reality, the Debtor, Houck, or their family members secretly owned and/or controlled.

6

29.     The Debtor also fraudulently and knowingly represented to CIBC in numerous certificates of compliance and loan modification agreements that FMSI was in compliance with the requirements of the loan documents.

30.     Moreover, the Debtor and Houck diverted the proceeds of the fraudulently obtained disbursements for their personal use and benefit, including to: (a) to fund the purchase of the Ellsworth Property; (b) to remodel their condominium in Fort Lauderdale, Florida; and (c) to fund their racehorse breeding and training hobby.

31.     Altogether, in reliance on the Debtor's fraudulent representations in borrowing base certificates, certificates of compliance, and loan modification agreements, CIBC advanced over $4.3 million to which FMSI was not entitled under the Loan Agreement.

32.     In September 2016, after RAMCO and the FMSI Borrowers defaulted on their obligations to CIBC, CIBC sued those entities and the Debtor in the Circuit Court of Cook County for breach of the applicable loan agreements and guaranties (the "**Breach of Contract Case**"). On September 27, 2017, the Circuit Court of Cook County awarded CIBC a $2,117,778.22 judgment against the Debtor, an $8,980,806.13 judgment against the FMSI Borrowers, and a $7,848,712.20 judgment against RAMCO in the Breach of Contract Case (collectively, the "**CIBC Judgments**").

33.     In June 2018, the Debtor and Brent Houck were indicted on five counts of wire fraud in connection with a bank fraud scheme. (*See United States v. Carol J. Delgado*, Case No. 18-cr-00122 (N.D. Ill.), Dkt. 16). Copies of the criminal complaint and supporting FBI affidavit are attached hereto as Exhibit A. That case has been delayed by COVID-19 and remains pending.

**B.  Defendants' Pre-Petition Efforts to Fraudulently Conceal and Divert Assets**

34.     After CIBC discovered the alleged fraud, the Debtor and the Delgado Insiders took numerous actions to divert and conceal the Debtor's and her companies' assets to the point that, from mid-2018 onwards, the Debtor was conducting her personal financial affairs virtually entirely through corporate alter egos (including Outsource and Ramco Holdings), the Delgado Relatives, and other proxies.

*i.  Diversion of Loan/Lease Portfolios to RAMCO Holdings.*

35.     For example, in September 2016, shortly after CIBC filed the Breach of Contract Case, the Debtor caused RAMCO and FMSI to enter into so-called "Receivables Purchase Agreements" with RAMCO Holdings, a new entity she had recently formed and wholly owned.

36.     Under the Receivables Purchase Agreements, RAMCO Holdings purported to acquire all of RAMCO's and FMSI's respective lease/loan portfolios (collectively, the "**Portfolio Receivables**") in exchange for $7 million and $8 million, respectively. RAMCO Holdings never paid those amounts (or any portion thereof).

37.     The Purchase Receivables Agreements were signed by the Debtor (as CEO and president of FMSI and RAMCO) and Brent Houck (as executive vice president of RAMCO Holdings).

38.     Over the next two years, the Debtor treated RAMCO Holdings as her personal piggy bank, routinely using funds in its bank accounts (sourced primarily from the RAMCO/FMSI receivables) to pay off her personal credit card bills.

39.     On May 29, 2019, following a two-day bench trial on CIBC's request for turnover of one of the loan portfolios RAMCO Holdings purported to acquire under the Purchase Receivables Agreements, the Circuit Court of Cook County found, *inter alia*:

a.  The Debtor "was the principal and owner of RAMCO and FMSI" and "is also the 100 percent owner and principal of RAMCO Holdings, LLC, an entity that operated as a shell holding company and had no operations and virtually no cash flow prior to September 13, 2016."

b.  "On or about September 13, 2016, Delgado directed that all collections from RAMCO and FMSI be deposited into [RAMCO] Holdings' bank account at MB Financial. In excess of $2 million of proceeds flowed through the [RAMCO] Holdings accounts, commencing on September 13, 2016, just after the filing of this lawsuit. Prior to that date, the [RAMCO] Holdings account had only one deposit in the amount of $1,478.72 in September. Delgado stopped depositing funds into the RAMCO and FMSI accounts at CIBC at the same time."

c.  "At trial, Delgado admitted that the payoff of certain RAMCO Leases and Loans generated in excess of $2 million in proceeds, but none of it was turned over to RAMCO or CIBC. Instead, Holdings kept those funds as purported administrative expenses."

d.  "It is undisputed that consideration was never paid [by RAMCO Holdings under the Receivables Purchase Agreements] and that [RAMCO] Holdings breached the Receivables Purchase Agreement by failing to make the required December 30, 2016 balloon payments. Thus, the transfers were illusory."

e.  "Holdings was never anything but a 'shell' holding company, and Delgado has admitted that $2.5 million of RAMCO Loan and Lease proceeds flowed through the [RAMCO Holdings] account, which she also used to pay personal expenses."

40.  These findings were not appealed and are entitled to preclusive effect in this adversary case, and demonstrate that RAMCO Holdings was merely a sham entity formed to further the Asset Concealment Conspiracy.

### ii.  Diversion of FMSI/RAMCO Portfolio Income and Personal Rents to Outsource Services LLC.

41.  In May 2018, and shortly after CIBC froze the RAMCO Holdings bank accounts, Delgado enlisted her ex-husband Jay Delgado to serve as the manager and nominal owner of her replacement piggy bank: Outsource Services, LLC ("**Outsource**").

42.     Jay Delgado formed Outsource on May 18, 2018 with himself as its sole member, manager, and registered agent. The Debtor's wholly-owned property at 18748 Tammy Drive in Mokena, Illinois (the "**Tammy Property**"), where Jay Delgado resides, is listed as Outsource's registered address.

43.     On May 31, 2018, the Debtor (on behalf of RAMCO Holdings) and Jay Delgado (on behalf of Outsource) signed a so-called "Portfolio Servicing Agreement" under which RAMCO Holdings purported to hire Outsource as an independent contractor for the stated purpose of providing billing, payment processing, and call-center customer support services for the solar panel lease and loan portfolios that RAMCO Holdings purported to acquire from RAMCO and FMSI under the Receivables Purchase Agreements.

44.     An unrelated solar industry call-center company also named Outsource Services, LLC is based in Sheridan, Wyoming and has been operating since 1995. (*See* www.outsourceservicesllc.com/about). Upon information and belief, the Debtor and Jay Delgado selected Outsource's name in an attempt to spoof this company.

45.     However, the Portfolio Servicing Agreement was merely a pretext for RAMCO Holdings to funnel funds to Outsource for the ultimate benefit of the Debtor and the Delgado Relatives.

46.     As contemplated by its terms, Outsource received dozens (and upon information and belief substantially all) of the FMSI/RAMCO customer payments from Spring 2018 until at least Fall 2020, and upon information and belief continues to receive such payments.

47.     However, Outsource did not remit the proceeds to RAMCO Holdings, as required by the Portfolio Serving Agreement. For example, after the Debtor and RAMCO Holdings failed to pay approximately $21,000 of the FMSI/RAMCO customer payments that they were ordered to

10

turn over to CIBC, the Cook County Circuit Court issued an order to show cause why the Debtor

should not be held in contempt. At a contempt hearing on January 16, 2020, the Debtor testified

that neither she nor RAMCO Holdings had the ability to pay CIBC approximately $21,000.

48.     Instead, Outsource paid substantial sums to Jay Delgado and Janaye Delgado, much

of which was characterized as "salary" payments. Outsource issued dozens of checks and wire

transfers to Jay Delgado and Janaye Delgado, ranging in amounts from several hundred dollars to

several thousand dollars each, on a near-weekly basis from mid-2018 until late 2020.

49.     In total, between September 2018 and September 2020, Outsource made payments

to Janaye Delgado totaling at least $48,434.44.

50.     In total, between August 2018 and March 2021, Outsource made payments to Jay

Delgado totaling at least $42,122.87.

51.     Outsource also replaced RAMCO Holdings as the principal payer of the Debtor's

credit card bills and other personal debts (including attorneys fees). For example, between

September 2018 and August 2019, Outsource paid the debtor's personal attorney at least

$62,451.64.

52.     The Debtor also diverted rental income generated from her investment properties

to Outsource in similar fashion. For example, as set forth in greater detail below, the Debtor

personally owned and rented out a second residence located at 13043 West Regan Road in Mokena,

Illinois (the "**Regan Property**").

53.     From March 2017 until March 2019, the Debtor rented the Regan Property to Elton

Tinsley in exchange for $3,200 per month. In March 2019, the Debtor and Tinsley entered into a

new lease under which Tinsley agreed to rent the Regan Property for $3,400 per month through

March 2022. Later in 2019, the Debtor evicted Tinsley after he purportedly damaged the property.

54.     Beginning in May 2018, after CIBC froze the account into which the Debtor had deposited Tinsley's April 2018 rent payment, the Debtor directed Tinsley to stop paying rent to her directly. Instead, she had Tinsley pay the May 2018 rent to Jay Delgado. From June 2018 until at least March 2019, Tinsley made rent payments to Outsource. Outsource would then pay the mortgage on that property, either directly or occasionally through Janaye Delgado.

55.     When asked at the January 16, 2020 contempt hearing why the rent payments were going to Outsource, the Debtor characterized Outsource as the "property manager."

56.     Outsource has continued receiving payments from FMSI's and RAMCO's customers during the Debtor's bankruptcy case, and disbursing those funds to or for the benefit of the Debtor, Jay Delgado, and Janaye Delgado.

57.     Moreover, as alleged in more detail below, Outsource was still collecting rental income generated by the Regan Property as recently as July 2022.

### iii.   Pre-Petition Violations of Asset Freezes and Discovery Obligations.

58.     CIBC served Delgado and Houck with Citations to Discover Assets shortly after entry of the CIBC Judgments in the Fall of 2017.

59.     Delgado did not provide any response until December 2018. When she finally responded, her response contained numerous fraudulent omissions and misrepresentations.

60.     For example, in response to CIBC's request that she disclose any owned real estate, the Debtor listed four of her Illinois properties (including the Regan Property and Tammy Property). However, she omitted her Florida residence, 209 N. Ft. Lauderdale Beach Blvd, #2A, Ft. Lauderdale, Florida 33304 (the "**Florida Condo**"), which she and Houck jointly owned.

61.     When CIBC asked the Debtor why she omitted the Florida Condo from her citation response, she produced a quit claim deed dated March 22, 2017 (the "**Quit Claim Deed**")

purporting to convey the Debtor's interest in the Florida Condo to Brent Houck for $50,000. A true and correct copy of the Quit Claim Deed is attached hereto as <u>Exhibit B</u>.

62.     However, the Quit Claim Deed was never recorded, and the Debtor continued living at the Florida Condo (along with her Illinois residence) after executing the Quit Claim Deed.

63.     Upon information and belief, Brent Houck never paid, and the Debtor never received, any portion of the $50,000 contemplated by the Quit Claim Deed. As of March 22, 2017, the value of the Debtor's interest in the Florida Condo was substantially greater than $50,000.

64.     The sham nature of the Quit Claim Deed is further demonstrated by the fact that the Debtor claimed to still own 50% of the Florida Condo in her bankruptcy schedules. Houck also filed proofs of claim in her bankruptcy case in which he admitted that the Debtor continued to own 50% of the Florida Condo as of the Petition Date.

65.     Thus, the sole purpose of the Quit Claim Deed was to provide a pretext for concealing a valuable asset from CIBC and thereby frustrate CIBC's ability to enforce and satisfy its judgment against the Debtor.

66.     Jay Delgado and Janaye Delgado were also knowingly complicit in this scheme, as evidenced by the fact that they each signed the Quit Claim Deed at witnesses.

67.     In her citation response, the Debtor also denied having any active leases or tenants. That was not true. For example, at that time, the Debtor was leasing out the Regan Property to Elton Tinsley at that time in exchange for $3,400 per month.

68.     She also failed and refused to produce account statements for her accounts at Associated Bank, Bank of America, U.S. Bank, and ETrade to CIBC in response to the citation.

69.     Moreover, the issuance of the citations acted as a freeze on Delgado's assets and prevented her and others from transferring them. Delgado did not comply with that freeze. For

example, Delgado withdrew or transferred more than $60,000 between herself, her corporate entities, and others from her Associate Bank accounts between February and May 2018, despite being subject to a citation.

70.     Outsource, Jay Delgado, and Janaye Delgado also failed to produce documents to CIBC in connection with third party citations CIBC served upon them in connection with enforcing its judgments.

71.     As another example, in the civil fraud case, CIBC issued interrogatories to Houck, asking him to identify, among other things: the owners and managers of various Delgado-related entities; any entities he owned or controlled; any bank accounts he owned or controlled; and any transactions among Houck, the Debtor, and entities they owned or controlled. Houck refused to respond to the substance of any of these inquiries. Instead, he simply objected to the defined terms they incorporated.

72.     Similarly, in response to CIBC's document requests to the Debtor in the civil fraud case, the Debtor refused to comply with document requests seeking similar categories of information on the basis of similarly evasive objections.

73.     As another example, when asked at the January 16, 2020 contempt hearing to "identify [her] current sources of income," the Debtor replied "me personally – I don't have any." She further denied having received any income during the period from June 1, 2018 until January 16, 2020. She also testified that she no longer had any bank accounts in her name, had no way to pay her bills, and "ha[d] been relying on the charity of others."

**C. The Defendants' Efforts to Fraudulently Conceal Assets and Information from the Trustee and Otherwise Frustrate the Bankruptcy Case.**

74.     The Defendants' pattern of diverting and concealing assets and of refusing to comply with their disclosure and discovery obligations has continued throughout the pendency of the Debtor's bankruptcy case.

*i.  The Debtor's Failure to Comply with Conversion Order.*

75.     The Conversion Order required the Debtor to: (a) account for and turn over to the Trustee all records and property of the estate on or before June 25, 2020; (b) file a schedule of all unpaid debts incurred after the commencement of her chapter 11 case by June 25, 2020; (c) file a final report and account by July 13, 2020; and file the statements and schedules required by Bankruptcy Rules 1019(5) and 1107(b) by June 25, 2020.

76.     On June 26, 2020, rather than comply with the Conversion Order, the Debtor and Houck moved to set aside or amend the order converting this case (Dkts. 60, 61), which motions the Court denied on July 2, 2020 (Dkt. 67, 68). To date, the Debtor still has not complied with the Conversion Order.

77.     On March 11, 2021, the Trustee filed a motion seeking open-ended authority under Federal Rule of Bankruptcy Procedure 2004 to obtain discovery from any "entities ('**Discovery Parties**') the Trustee believes might have information relating to the acts, conduct, or property or to the liabilities and financial condition of the [D]ebtor, or to any matter which may affect the administration of the [Debtor's estate] (the '**Investigation**')[.]" (Dkt. 122).

78.     On March 18, 2021, the Court entered an *Order Authorizing Trustee to Issue Rule 2004 Subpoenas* [Dkt. 124] (the "**Rule 2004 Order**"). The Rule 2004 Order authorized the Trustee to "demand and compel by way of subpoena: (i) the oral examination, under oath of any Discovery Party; and (ii) the production of documents that might be relevant to the Investigation or lead the

15

Trustee to information relevant to the Investigation." (Rule 2004 Order, ¶ 2). The Rule 2004 Order

further directed the Trustee to "serve any subpoena issued under [the Rule 2004 Order] by

overnight mail" (*id.* ¶ 3(a)) and required Discovery Parties to "within 14 days of service of [a]

subpoena: (i) produce all non-privileged documents responsive to such subpoena; or (ii) file and

serve a motion seeking a protective order[.]" (*Id.* ¶ 3(b)).

### iii.   The Defendants' Refusal to Comply with Rule 2004 Subpoenas and Compulsion Order.

79.     On April 9, 2021, the Trustee issued Rule 2004 subpoenas to the Brent Houck, Jay

Delgado, Janaye Delgado, and Nicholas Delgado seeking documents concerning, *inter alia*,

transactions between them, the Debtor, or any entity any of them owned or controlled (the "**Rule

2004 Subpoenas**").

80.     That same day, the Trustee served the Rule 2004 Subpoenas, and a copy of the Rule

2004 Order, by overnight mail to the Delgado Relatives' respective last-known addresses in

accordance with the Rule 2004 Order, and also served them on the Debtor by overnight mail.

81.     The deadline for the Delgado Relatives to respond to the subpoenas was April 23,

2021. (*See* Rule 2004 Order, ¶ 3(b)). On that day, Brent Houck contacted the Trustee's counsel to

request an extension until May 23, 2021 to respond, which the Trustee granted. The Trustee did

not receive (and still has not received) any response from Jay Delgado, Janaye Delgado, or

Nicholas Delgado. None of the Delgado Relatives have moved for a protective order or to quash

the Rule 2004 Subpoenas, and have therefore waived the right do so.

82.     On May 27, 2021, the Trustee's counsel sent letters to Jay Delgado, Janaye

Delgado, and Nicholas Delgado (the "**May 27 Letters**"), notifying them that they were in default

of their obligations under the Rule 2004 Subpoenas and the Rule 2004 Order (which were provided

once again) and that the Trustee intended to file a motion to compel their compliance if they did not produce the requested documents or otherwise contact the Trustee by June 10, 2021.

83.     The Trustee sent the May 27 Letters to Jay Delgado, Janaye Delgado, and Nicholas Delgado by overnight mail to their respective last-known addresses (including multiple addresses for each of Janaye Delgado and Nicholas Delgado), as well as by email to their last-known email addresses (including multiple email addresses for Janaye Delgado). The Trustee also sent copies of the May 27 Letters to the Debtor by overnight mail to her residences in Illinois and Florida.

84.     On September 24, 2021, the Trustee's counsel sent a letter (the "**September 24 Letter**") to the Debtor requesting that she comply with her statutory duties by: (a) surrendering certain documents and other recorded information to the Trustee concerning her assets, liabilities, and prepetition financial affairs on or before October 8, 2021; (b) amending her Schedules of Assets and Liabilities and Statement of Financial Affairs to address certain inaccuracies, omissions, and other apparent discrepancies (or explain why no amendment is needed) on or before October 8, 2021; (c) attending a section 341 meeting during the week of October 25, 2021; and (d) ensuring that her son, daughter, and ex-husband were aware of their obligations under the Rule 2004 subpoenas issued to them.

85.     The Trustee's counsel sent the September 24 Letter by overnight mail to the Debtor's address of record, as well as to an email address the Debtor used to communicate with the Trustee as recently as July 2021.

86.     On December 23, 2021, after the Debtor and the Delgado Relatives still had not complied in any way with the Trustee's requests for documents and information concerning the Debtor's assets, liabilities, and prepetition financial affairs, the Court entered an order compelling them to do so by January 6, 2022 (Dkt. 154) (the "**Compulsion Order**").

87.    The Compulsion Order also required the Debtor to:

a.   On or before January 6, 2022, amend her schedules and statement of financial affairs to ensure they are true and correct, including without limitation, with respect to the items identified in the Motion and in the September 24 Letter;

b.   On or before January 6, 2022, cure her failure to comply with the requirements of paragraph 3 of the Court's Order Converting Case Under Chapter 11 to Case Under Chapter 7 (Dkt. 50); and

c.   On or before January 21, 2022 (or such other time as the Trustee may request), attend a section 341 meeting conducted by the Trustee.

88.    Neither the Debtor nor any of the Delgado Relatives have complied with any of the requirements of the Compulsion Order.

89.    On August 15, 2022, the Court entered a judgment denying the Debtor a discharge of debts pursuant to section 727(a)(3)-(6) of the Bankruptcy Code based on, *inter alia*, the Debtor's failure to comply with the Conversion Order and Compulsion Order.

### iv.   *The Defendants' Refusal to Comply with Turnover Order.*

90.    On July 21, 2022, the Court entered an order directing the Debtor, Jay Delgado, Janaye Delgado, Nicholas Delgado, Brent Houck, Outsource Services LLC, and Ellsworth Investment Group LLC (collectively, the "**Turnover Defendants**") to, on or before July 28, 2022, turn over to the Trustee:

(a)  Exclusive possession of the land and improvements located at the Regan Property, Tammy Property, and Ellsworth Property;

(b)  All keys, alarm and access codes, and other items or information necessary for the Trustee to access and secure the Regan Property, Tammy Property, and Ellsworth Property;

(c)  All non-exempt personal property of the Debtor located at the Regan Property, Tammy Property, and/or Ellsworth Property (along with a complete and accurate accounting of any such personal property);

(d) All rental income generated by the Regan Property, Tammy Property, or Ellsworth Property since the Petition Date (along with a complete and accurate accounting of any such rental income); and

(e) All beneficial interests in Trust No. 8002368555 of Chicago Title Land Trust Company [(the "**Ellsworth Land Trust**")].

(Dkt. 175, the "**Turnover Order**").

91.     The Turnover Order also provided that, "To the extent the [Turnover Defendants] fail to comply with the requirements of this Order, they shall each be jointly and severally liable to the Trustee for the value of any property withheld from the Trustee in violation of this Order, along with any other damages the estate incurs as a result of such failure."

92.     On June 21, 2022, the Trustee served copies of the Turnover Order and the Compulsion Order on the Turnover Defendants by overnight mail to their respective last known addresses (including the Regan Property), as well as electronically to the Debtor's, Brent Houck's, Jay Delgado's, Janaye Delgado's, and Nicholas Delgado's respective last known email addresses.

93.     None of the Turnover Defendants have complied with the requirements of the Turnover Order.

94.     On August 1, 2022, the Debtor and Houck commenced an appeal of the Turnover Order. The appeal remains pending, but no stay pending appeal has been issued.

*v.  The Defendants' Fraudulent Collection and Concealment of Postpetition Rents.*

95.     The Debtor and the Delgado Relatives have continued to fraudulently conceal assets and information from the Trustee and otherwise frustrate the proper administration of the Bankruptcy Case.

96.      On February 13, 2020, the Debtor filed her schedules of assets and liabilities ("**Schedules**") and statement of financial affairs ("**SOFA**").

19

97.     In Schedule A/B, the Debtor admitted that she was the sole owner of the Tammy Property and Regan Property, which she characterized as "investment properties."

98.     In Schedule I, the Debtor listed "Real Estate Investment" as her occupation. She listed her net income as $0.00, yet stated that "Rental income is expected to significantly higher [within the next year] due to repairs to properties and new tenant."

99.     The Debtor did not disclose any executory contracts or unexpired leases in Schedule G.

100.    At her March 20, 2020 section 341 meeting in Florida (the "**Florida 341 Meeting**"), when asked whether any of her properties were currently rented out, the Debtor testified that she was renting the Tammy Drive property to a tenant for $1,500 per month.

101.    The Debtor was referring to Jay Delgado, who has continued to occupy the Tammy Drive property since the Petition Date without paying any rent to the Trustee.

102.    At the Florida 341 Meeting, the Debtor further testified that the Regan Property "typically rents for about $3,400 a month" but that she had recently evicted a tenant from that property, that it was "just being listed now," and that she "expect[ed] in the next month it'll be [rented]." Before he was evicted, the prior tenant Elton Tinsley had rented the Regan Property for a term from March 2019 through March 2022.

103.    Upon information and belief, the Debtor had already found a new tenant to replace Mr. Tinsley before the Petition Date. According to public record searches, an individual named Courtney Wright lived at the Regan Property from December 2019 until June 2022. On July 29, 2021, the Debtor and Jay Delgado—through Outsource—listed the Regan Property for rent for $3,900 per month before removing the listing five days later.

104.    Upon information and belief, the Debtor rented the Regan Property to Courtney Wright or another tenant for approximately $3,900 per month from the Petition Date to June 2022.

105.    In April 2022, upon information and belief because the existing lease was about to expire, the Debtor and Jay Delgado—through Outsource—listed the Regan Property for rent at $4,500 per month.

106.    On June 3, 2022, the Debtor purported to entered into a lease (the "**Baker Lease**") of the Regan Property with Mamdouh Baker, an innocent third party who responded to the rental listing without knowing of the Debtor's pending bankruptcy or criminal proceedings. The Baker Lease identifies "Outsource Services, LLC c/o Jay Delgado" as the putative property manager.

107.    Under the Baker Lease, Baker agreed to pay monthly rent of $4,300 for a one-year term ending June 5, 2023. Baker also agreed to pay at the start of the least the first month's rent, last month's rent, and a $4,500 security deposit.

108.    On June 21, 2022, as contemplated by the Baker Lease, Baker wired $8,600 on account of the first month's rent and the last month's rent to Outsource's BMO Harris account ending 9524 (the "**Outsource Account**"). The Debtor directed Baker to send the funds to this account.

109.    Between June 3-5 2022, at the Debtor's direction, Baker paid the $4,500 security deposit to Janaye Delgado's PNC account (the "**Janaye Account**"). This amount was paid in several installments due to the Zelle payment service's $2,000-per-day transaction limit.

110.    On July 5, 2022 Baker paid an additional $2,700 to the Outsource Account for July 2022 rent (equal to $4,300 less a $1,600 deduction for certain out-of-pocket expenses Baker paid for certain repairs to the property).

21

111.    On July 22, 2022, after the Trustee served a copy of the Turnover Order to the Regan Property, Baker became aware of the Debtor's pending bankruptcy and criminal cases and contacted the Trustee's counsel. Baker has indicated that the Debtor and Jay Delgado have stopped responding to his inquiries and that his calls to them now go directly to voicemail.

112.    In total, upon information and belief, the Defendants fraudulently collected and concealed as much as $171,600 in postpetition rent from the Tammy Property and Regan Property, comprising:

      a.    $45,000 for the Tammy Property from February 2020 through July 2022 ($1,500 per month for 30 months).

      b.    $109,200 for the Regan Property from February 2020 through May 2022 ($3,900 per month for 28 months)

      c.    $15,800 for the Regan Property under the Baker Lease.

113.    Upon information and belief, the Defendants may have also fraudulently collected and concealed post-petition rent generated by the Ellsworth Property. For example, according to internet searches, the Ellsworth Property is listed as the address for the Abear Law Offices, a local law firm as recently as July 2021. However, due to the Debtor's and the Delgado Relatives' failure to comply with the Compulsion Order and Rule 2004 Subpoenas, the Trustee has not been able to confirm the existence or amount of rents generated by the Ellsworth Property.

## COUNT I
## EQUITABLE ACCOUNTING
### (All Defendants)

114.    The Trustee restates and incorporates by reference paragraphs 1 through 113 as though fully set forth herein.

115.    As reflected in the Turnover Order, the Turnover Defendants were required to turn over to the Trustee by July 28, 2022 all rental income generated by the Regan Property, Tammy Property, and Ellsworth Property (the "**Rents**") since the Petition Date. They failed to do so.

116.    The Turnover Order also required the Turnover Defendants to deliver to the Trustee by July 28, 2022 a complete and accurate accounting of all such rental income. They failed to do so.

117.    The post-petition Rents include, at a minimum, the $15,800 paid by Mamdouh Baker under the Baker Lease. Upon information and belief, the post-petition Rents are substantially greater than that amount and encompass as much as $171,600 from the Regan Property and Tammy Property alone.

118.    In addition to the post-petition Rents, upon information and belief, the Estate is also entitled, either directly or as assignee of CIBC, to recover money or other property from the Defendants and unknown third parties based on, among other potential claims:

   a.   Claims under 11 U.S.C. §§ 542, 544, 547, 548, 549, and/or 550 to recover the Rents and Portfolio Receivables and/or any related proceeds, or the value thereof.

   b.   Claims for constructive trust, breach of fiduciary duty, conversion, trespass, unjust enrichment, civil fraud, civil conspiracy, alter ego, and/or veil-piercing under Illinois law based on, at a minimum, the diversion of the Rents and Portfolio Receivables and fraudulent concealment of related documents and information.

c.  Sanctions under section 105 of the Bankruptcy Code and Bankruptcy Rules 7037
    and 7070 based on violating the Compulsion Order and Turnover Order.

d.  Claims under 18 U.S.C. § 1964(c)-(d) to recover damages for injuries the Estate
    and/or CIBC sustained due to the Defendants' and their co-conspirators' myriad
    acts of wire fraud, obstruction of justice, and bankruptcy fraud in furtherance of the
    Asset Concealment Conspiracy.

119.    Presently, except to the extent alleged herein, the Trustee lacks knowledge,
documents, and information sufficient to determine: (i) the existence, amount, source, current
status, and location of the Rents and Portfolio Receivables and any related proceeds; (ii) the
universe of corporate entities, bank accounts, and other assets owned and controlled either directly
or indirectly by the Defendants; and (iii) the universe of transactions among the Defendants, their
family members, and their respective corporate proxies.

120.    Such knowledge, documents, and information are within the exclusive possession
and control of the Defendants.

121.    The Trustee is entitled to such information and documents by virtue of *inter alia*
the Conversion Order, the Compulsion Order, and the Turnover Order.

122.    The Debtor has knowingly and fraudulently concealed such knowledge,
documents, and information from the Trustee, including by omitting the Rents and underlying
leases from her bankruptcy schedules, refusing to testify at a post-conversion 341 meeting, and
refusing to comply with the Conversion Order, Compulsion Order, and Turnover Order.

123.    The Delgado Insiders have knowingly and fraudulently concealed such knowledge,
documents, and information from the Trustee, including by failing to comply with their respective
obligations under the Rule 2004 Subpoenas, Compulsion Order and Turnover Order.

24

124.     As a debtor-in-possession under 11 U.S.C. § 1107, the Debtor owed fiduciary duties to the Estate. The Debtor breached those fiduciary duties by, *inter alia*, knowingly and intentionally: (a) concealing and diverting Rents and other assets; (b) concealing information and documents concerning her assets and financial affairs; and (c) refusing to comply with the Conversion Order, Compulsion Order, and Turnover Order.

125.     The Delgado Insiders aided and abetted the Debtor's breach of her fiduciary duties to the Estate by, *inter alia*, refusing to comply with the Compulsion Order and Turnover Order.

126.     The Trustee has an inadequate legal remedy, including without limitation because: (a) she has no way to ascertain the full extent of the transactions that may give rise to liability to the Estate; (b) she has no way to ascertain the full extent of potential defendants against whom the Estate may hold valid claims; (c) she has no way to ascertain the amount of damages for which each Defendant and other potential defendant is liable; and (d) monetary sanctions are insufficient to compel the Defendants to comply with their discovery obligations because they will refuse to pay and then claim an inability to pay to avoid being held in contempt (just as the Debtor did at the January 2020 contempt hearing).

127.     The Trustee is therefore entitled to entry of an Order compelling the Defendants to file under penalty of perjury a full and complete chronological accounting, from January 1, 2016 to date on which the accounting is filed (the "**Accounting Period**"), that includes each of the following components (together, the "**Accounting**"):

(i)       a complete listing of each corporate or trust entity that is or was at any point after January 1, 2010 owned, managed, or controlled by any Defendant (whether directly, indirectly, completely, partially, or otherwise) (the "**Insider Entities**") supported by legible copies of the governing documents for each such entity;

(ii)  a complete listing of each financial account for which any Defendant or any Insider is or was an account holder or authorized signatory at any point during the Accounting Period, supported by legible copies of all monthly statements for each such account during the Accounting Period;

(iii)  a complete and chronological accounting of all transfers of money or other property during the Accounting Period among[1] any Defendant or Insider Entity and any other Defendant or Insider Entity, and any subsequent transfer(s) thereof, supported by legible copies of any and all available supporting documentation, including but not limited to, cancelled checks; bills; invoices; receipts; bank and other statements; ledgers; computer printouts; memoranda; communications; and all other tangible evidence relating thereto; and

(iv)  a complete and chronological accounting of all receipts of money or other property during the Accounting Period by any Defendant or any Insider Entity from any current, former, or prospective tenant of the Regan Property, Ellsworth Property, or Tammy Property (or from a third party on behalf of any such person), and any subsequent transfer(s) thereof, supported by legible copies of any and all available supporting documentation, including but not limited to, leases; cancelled checks; bills; invoices; receipts; bank and other statements; ledgers; computer printouts; memoranda; communications; and all other tangible evidence related thereto; and

(v)  A complete and chronological accounting of all receipts of money or other property during the Accounting Period by any Defendant or any Insider Entity from any third party on account of any "Receivable" contemplated by the Receivables Purchase Agreements, and any subsequent transfer(s) thereof, supported by legible copies of any and all available supporting documentation, including but not limited to, leases; cancelled checks; bills; invoices; receipts; bank and other statements; ledgers; computer printouts; memoranda; communications; and all other tangible evidence related thereto.

---

[1] As used herein, the term "among" includes each of the following: "to," "from," "to or from a third party for the benefit of," and "to or from a third party on behalf of."

## COUNT II
## CONVERSION
### (Turnover Defendants)

128.    The Trustee restates and incorporates by reference paragraphs 1 through 113 as though fully set forth herein.

129.    As reflected in the Turnover Order, the Turnover Defendants were required to turn over to the Trustee by July 28, 2022 all rental income generated by the Regan Property, Tammy Property, and Ellsworth Property since the Petition Date (the "**Rents**"). They failed to do so.

130.    The Trustee therefore has an absolute and unconditional right to the immediate possession of the Rents.

131.    The Trustee has demanded that the Turnover Defendants deliver the Rents to the Trustee, to no avail.

132.    The Turnover Defendants have wrongfully and without authorization assumed control and ownership over the Rents and refused to turn them over to the Trustee.

133.    As a direct, foreseeable, and proximate result of the Turnover Defendants' conversion of the Rents, the Estate has been damaged in an amount to be proven at trial.

134.    As reflected in the Turnover Order, the Turnover Defendants are jointly and severally liable to the Trustee for all such damages.

## COUNT III
## CIVIL CONSPIRACY
### (All Defendants)

135.    The Trustee restates and incorporates by reference paragraphs 1 through 113 as though fully set forth herein.

27

136.    Each Defendant knowingly and intentionally agreed to one or more common schemes or plans to fraudulently conceal and withhold property, documents, and information from the Trustee, CIBC, and the Debtor's other creditors.

137.    The Defendants' agreement or agreements were entered into for the unlawful purpose of fraudulently diverting and concealing assets from the Debtor's creditors and, from June 2020 onwards, from the Trustee.

138.    The Asset Concealment Conspiracy began no later than in September 2016 when the Debtor and Houck fraudulently diverted FMSI's and RAMCO's valuable Portfolio Receivables to RAMCO Holdings under the sham Receivables Purchase Agreements.

139.    Jay Delgado and Janaye Delgado knowingly and intentionally assented to and joined the Asset Concealment Conspiracy no later than March 2017 when they signed the Quit Claim Deed as witnesses.

140.    Outsource knowingly and intentionally assented to and joined the Asset Concealment Conspiracy no later than May 2018, when Jay Delgado formed Outsource and Outsource began collecting rental income owed to the Debtor under the pretense of serving as "property manager."

141.    Janaye Delgado's knowing and intentional assent to the Asset Concealment Conspiracy can further be inferred from her receipt of funds diverted through Outsource (and other entities owned and/or controlled by the Debtor) into her bank accounts, and subsequent use of those funds to pay mortgage, credit card, and other debts owed by the Debtor.

142.    Nicholas Delgado knowingly and intentionally assented to and joined the Asset Concealment Conspiracy no later than April 2021, when he failed to comply with the Trustee's Rule 2004 Subpoena.

143.     EIG knowingly and intentionally assented to and joined the Asset Concealment
Conspiracy no later than July 21, 2021, when it failed to comply with the Turnover Order.

144.     As evidenced by the Defendants' ongoing failure to comply with the Compulsion
Order and Turnover Order, each Defendant continues to knowingly and intentionally facilitate the
Asset Concealment Conspiracy.

145.      The Asset Concealment Conspiracy and the conduct undertaken by the Defendants
in furtherance of it has injured, and continues to injure, the Estate by, among other things, depriving
the Estate of its property, frustrating the Trustee's ability to investigate and pursue additional
sources of recovery, and forcing the Estate to incur substantial additional professional fees and
other administrative expenses to locate and recover the property, documents, and information
fraudulently withheld from the Trustee.

146.     The Defendants are each jointly and severally liable as co-conspirators for the
actions, omissions, or other conduct taken by any other Defendant or other co-conspirator in
furtherance of the Asset Concealment Conspiracy.

## COUNT IV
### ENFORCEMENT OF COMPULSION ORDER AND TURNOVER ORDERS
#### (Federal Rule of Bankruptcy Procedure 7070)
#### (Turnover Defendants)

147.     The Trustee restates and incorporates by reference paragraphs 1 through 113 as
though fully set forth herein.

148.     The Compulsion Order required the Debtor and each of the Delgado Relatives to
take specific acts, including without limitation, to produce responsive documents and information
to the Trustee's discovery requests on or before January 26, 2021.

149.     Neither the Debtor nor any of the Delgado Relatives have produced any documents or information responsive to the Rule 2004 subpoenas issued to them by the Trustee. Nor have they otherwise complied with any of the requirements of the Compulsion Order.

150.     The Turnover Order required the Turnover Defendants to deliver exclusive possession and control of the Regan Property, Tammy Property, and Ellsworth Property (and all keys, alarm and access codes, and other items or information necessary for the Trustee to access and secure those properties) by July 28, 2021. The Turnover Defendants failed to do so.

151.     The Turnover Order required the Turnover Defendants to turn over all non-exempt personal property of the Debtor located at the Regan Property, Tammy Property, and/or Ellsworth Property to the Trustee (along with a complete and accurate accounting of any such personal property) by July 28, 2021. The Turnover Defendants failed to do so.

152.     The Turnover Order required the Turnover Defendants to turn over the Rents to the Trustee (along with a complete and accurate accounting of any such rental income) by July 28, 2021. The Turnover Defendants failed to do so.

153.     The Turnover Order required the Defendants to turn over all beneficial interests in the Ellsworth Land Trust on or before July 28, 2021. The Defendants failed to do so.

154.     The Trustee is entitled to entry of an order under Federal Rule of Bankruptcy Procedure 7070 and Federal Rule of Civil Procedure 70(b) vesting title to all beneficial interests in the Ellsworth Land Trust in the Trustee.

155.     The Trustee is entitled to entry of an order under Bankruptcy Rule 7070 and Federal Rule of Civil Procedure 70(c) directing the issuance of a writ of attachment against the entirety of each Turnover Defendant's property to compel their obedience with their respective obligations under the Compulsion Order and Turnover Order.

156.    The Trustee is entitled to entry of an order under Bankruptcy Rule 7070 and Federal Rule of Civil Procedure 70(d) directing the issuance of a writ of assistance to the United States Marshals Service to take any and all steps necessary to assist the Trustee and/or her representatives to: (a) gain access to and secure possession, custody, and control of the Regan Property, Tammy Property, and Ellsworth Property; (b) secure possession, custody, and control of the Debtor's non-exempt personal property located at the Regan Property, Tammy Property, and/or Ellsworth Property; (c) secure possession, custody, and control of the Rents; and (d) secure possession, custody, and control of the documents and information needed to conduct the accountings mandated by the Turnover Order.

### COUNT V
### AVOIDANCE OF UNPERFECTED QUIT CLAIM DEED
### 11 U.S.C. §§ 544(a)(3) and 550
### (Brent Houck)

157.    The Trustee restates and re-alleges paragraphs 1 through 113 of this Complaint as though fully set forth herein.

158.    Under section 544(a)(3) of the Bankruptcy Code, the Trustee has the rights and powers of, and may avoid any transfer of property of the Debtor or any obligation incurred by the Debtor that is voidable by, a properly perfected bona fide purchaser of real property from the Debtor as of the Petition Date.

159.    Under Florida law, an unrecorded conveyance or transfer of real property, or of any interest therein, is not effective against creditors or subsequent bona fide purchasers of the property.

160.    A properly perfected bona fide purchaser of the Florida Condo from the Debtor as of the Petition Date has the right to avoid a prior unrecorded deed.

31

161.    By executing and delivering the Quit Claim Deed to Houck, the Debtor conveyed her interest in the Florida Condo to Houck.

162.    The Quit Claim Deed was not recorded as of the Petition Date, nor at any time thereafter.

163.    The Trustee is therefore entitled under section 544(a)(3) of the Bankruptcy Code to avoid the transfer of any interest in the Florida Condo that Houck obtained from the Debtor under the Quit Claim Deed, and to recover such interest or its value from Houck under section 550 of the Bankruptcy Code.

**COUNT VI**
**AUTHORIZATION TO SELL FLORIDA CONDO**
**FREE AND CLEAR OF CO-OWNER'S INTEREST**
**11 U.S.C. § 363(h)**
**(Brent Houck)**

164.    The Trustee restates and re-alleges paragraphs 1 through 113 of this Complaint as though fully set forth herein.

165.    Section 363(b) of the Bankruptcy Code provides that, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).

166.    Section 363(h) further provides that "Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety . . . ." 11 U.S.C. § 363(h).

167.    The Debtor and Houck have both admitted that the Debtor and Houck co-owned the Florida Condo as tenants in common as of the Petition Date.

168.     Alternatively, to the extent the Quit Claim Deed conveyed the Debtor's interest in the Florida Condo to Houck, it is not effective against and can be avoided by the Trustee.

169.     Thus, the Estate has an undivided equitable interest in the Florida Condo.

170.     Partition in kind of the Florida Condo between the Estate and Houck is impracticable.

171.     The sale of the Estate's undivided interest in the Florida Condo would realize significantly less for the Estate than a sale of the Florida Condo free and clear of Houck's interest in the Florida Condo.

172.     The benefit to the Estate of a sale of the Florida Condo free and clear of Houck's interest outweighs the detriment, if any, to Houck.

173.     Upon information and belief, the Florida Condo is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

174.     The Trustee should therefore be permitted under section 363(h) of the Bankruptcy Code to sell the Florida Condo free and clear of Houck's interest.

**COUNT VII**
**CLAIM DISALLOWANCE**
**11 U.S.C. § 502(d)**
**(Brent Houck)**

175.     The Trustee restates and incorporates by reference paragraphs 1 through 113 as though fully set forth herein.

176.     Brent Houck filed Claim Nos. 16, 17, and 18 against the Estate.

177.     As reflected in the Turnover Order, Brent Houck is an entity from which property is recoverable under section 542 of the Bankruptcy Code.

178.   Houck has not paid the amount, or turned over the property, for which he is liable under section 542 of the Bankruptcy Code and the Turnover Order.

179.   As reflected in Count V of this Complaint, Brent Houck is the transferee of a transfer that is avoidable under section 544 of the Bankruptcy Code, and is also an entity from which property is recoverable under section 550 of the Bankruptcy Code.

180.   Houck has not paid the amount, or turned over the property, for which he is liable under section 550 of the Bankruptcy Code.

181.   The Trustee is therefore entitled to entry of an order under section 502(d) of the Bankruptcy Code disallowing and expunging Claim Nos. 16, 17, and 18 with prejudice.

**WHEREFORE** the Trustee prays that this Court enter judgment against the Defendants as follows:

A.   On Count I, directing the Defendants to file a complete and accurate Accounting (as defined above), along with all supporting documentation, under penalty of perjury within 30 days;

B.   On Counts II and III, awarding the Trustee damages against each Defendant, jointly and severally in an amount to be proved at trial, on account of the injuries the Estate sustained as a result of the Defendants' acts of conversion and in furtherance of the Asset Concealment Conspiracy more generally;

C.   On Count IV, (i) vesting title to all beneficial interests in the Ellsworth Land Trust in the Trustee; (ii) directing issuance of one or more writs of attachment against the entirety of each Turnover Defendant's property (including, without limitation, the Outsource Account, Janaye Account, and Houck's interest in the Florida Condo) to compel the Turnover Defendants to obey the Compulsion Order and Turnover Order; and (iii) issuing a writ of assistance directing the U.S. Marshals to take any other actions or steps required to assist the Trustee in enforcing the Compulsion Order and Turnover Order.

D.   On Count V, avoiding the transfer of the Debtor's interest in the Florida Condo under the Quit Claim Deed under section 544(a)(3) of the Bankruptcy Code and directing Houck to return such interest or its value to the Estate under 550 of the Bankruptcy Code.

34

E.      On Count VI, authorizing the Trustee to market and sell a 100% interest in
        the Florida Condo under section 363(h) of the Bankruptcy Code (subject to
        the Court's approval of a specific proposed sale); and

F.      On Count VII, disallowing and expunging Claim Nos. 16, 17, and 18 filed
        by Brent Houck with prejudice.


Dated: October 4, 2022                          Respectfully submitted,

                                                GINA B. KROL, not individually but as
                                                chapter 7 trustee for the estate of Carol J.
                                                Delgado

                                                By: *Ronald R. Peterson*

                                                Ronald R. Peterson (2188473)
                                                William A. Williams (6321738)
                                                JENNER & BLOCK LLP
                                                353 N. Clark Street
                                                Chicago, Illinois 60654-3456
                                                PH:    312-923-2981
                                                FAX:  312-840-7381

                                                *Special Counsel to the Trustee*

35